**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**December 9, 2020**

# In the Court of Appeals of Georgia

A20A1686. SIMPSON v. THE STATE.

HODGES, Judge.

A jury convicted Jacob Simpson of rape, two counts of aggravated sodomy, kidnapping, theft by taking, and aggravated assault with intent to rape as a result of sexual assaults and other crimes he perpetrated against two women. Simpson appeals, contending that the trial court erred in refusing him his right of self-representation and that he received ineffective assistance of trial counsel. For the reasons that follow, we affirm Simpson's convictions.

"On appeal from a criminal conviction, a defendant no longer enjoys the presumption of innocence, and the evidence is viewed in the light most favorable to the guilty verdict." (Citation omitted.) *Walker v. State*, 349 Ga. App. 188 (825 SE2d 578) (2019).

Here, the evidence shows that on August 18, 2007, C. S. encountered Simpson, whom she knew from church, at a bus station. She invited Simpson to stay the night at her house so they could attend church together the following morning, which they did. Following church, the two got food together and returned to C. S.'s apartment. At that point, Simpson began acting erratically, telling C. S. that she should be his wife, that they should have sex, and pulling down her shirt in a way that exposed her breasts. C. S. was scared and uncomfortable, so she told him she did not want sex, but offered him a massage as a way to try to get him to calm down. Simpson told C. S. that he still wanted to have sex with her, but she said no. He then hit her and shoved her into her closet. He forced her to her knees to perform oral sex on him, then got a condom and raped her. At one point she tried to escape, but he hit her again.

Following this rape, Simpson took C. S.'s purse, keys, and phone. They then drove around in a blue Dodge Magnum owned by C. S.'s father's friend. Although Simpson had opportunities to escape, she did not do so because she did not want to have to admit to anyone what had just happened to her. Eventually C. S. and Simpson returned to her apartment and spent the night there. At one point, C. S. called her brother and reported to him that she had been raped and that she needed him to wire her money so that her attacker would release her. C. S. retrieved the wired money at

a grocery store. Ultimately, C. S. came to the conclusion that she would not be able to appease Simpson into releasing her, and that she needed to escape. When they stopped near a fast food restaurant, she ran inside and reported the rape.

C. S. received a sexual assault examination at the hospital, at which time a vaginal swab was obtained. The emergency room doctor noted that C. S. had an abrasion on her lip, and she was tearful in recounting her ordeal. Testing of C. S.'s vaginal swab detected seminal fluid from Simpson.

Not long after C. S.'s escape, in the early morning hours of August 22, 2007, N. H., who was 17 at the time, was walking home from the store when she felt like she was being followed. Simpson pulled up next to her in a blue Magnum and offered her a ride, which she accepted. Instead of taking her in the direction of her home, Simpson drove her to an abandoned building, where he dragged her inside and placed her breast in his mouth, sodomized her, and forced her to perform oral sex on him.[1] After the assault, N. H. was able to memorize Simpson's licence plate number as he drove away, and she called police.

---

[1] N. H. provided confusing testimony as to her belief about whether Simpson ejaculated while sodomizing her. She testified that she did not remember him ejaculating, but in response to a question about whether she told police that Simpson ejaculated, she responded "[y]eah, he did."

A sexual assault examination was performed on N. H., and swabs were taken. N. H. had an anal tear which appeared fresh and was consistent with sodomy. N. H. was sad and tearful during her examination. Analysis of swabs taken from N. H.'s rectum and breast revealed the presence of Simpson's DNA on N. H.'s breast, but not her rectum.

Simpson was subsequently apprehended driving the blue Magnum he stole from C. S. Police investigation determined that C. S. and N. H. did not know each other.

As a result of the assaults against C. S. and N. H., Simpson was charged with multiple crimes and appointed counsel. He filed a bar complaint against his initial appointed counsel, so the trial court appointed new counsel for trial. That attorney represented Simpson at his jury trial, which resulted in Simpson being convicted of rape, two counts of aggravated sodomy, kidnapping, theft by taking, and aggravated assault with intent to rape. Following the denial of his motion for new trial, Simpson appeals.[2]

---

[2] We take this opportunity to note that the crimes at issue occurred in 2007 and this trial was conducted in 2012. Although Simpson raises no claim of prejudice as a result, our Supreme Court has strongly rebuked delay in the resolution of post-conviction matters. See, e.g., *Owens v. State*, 303 Ga. 254, 259-260 (4) (811 SE2d 420) (2018). As our Supreme Court explained,

1. Simpson contends that he was denied his right to self-representation at trial. We disagree.

It is well-settled that

> [b]oth the federal and state constitutions guarantee a criminal defendant the right to self-representation. See *Faretta v. California*, 422 U. S. 806 (95 SCt 2525, 45 LEd2d 562) (1975); 1983 Ga. Const., Art. I, Sec. I, Par. XII. *An unequivocal assertion of the right to represent oneself, made prior to trial*, should be followed by a hearing to ensure that the defendant knowingly and intelligently waives the right to counsel and understands the disadvantages of self-representation.

(Emphasis supplied.) *Thaxton v. State*, 260 Ga. 141, 142 (2) (390 SE2d 841) (1990).

Here, the following exchange occurred after the clerk read the names of the jurors selected for service:

---

> even if long-delayed appeals rarely result in outright reversals of convictions or only retrials or resentencings, these extended and unjustified delays in resolving criminal cases make our State's criminal justice system appear unfair and grossly inefficient. ... [W]e must all work to prevent delays, particularly in the most serious of our criminal cases, that cannot be explained or justified to the parties in those cases, the victims of crimes, and the public we serve.

Id.

5

Clerk: Your honor, this is our jury

Court: All right. State, look upon the jury. Is this the jury selected by the State?

Prosecutor: It is, your honor.

Court: All right. And is the manner of selecting the jury acceptable to the State?

Prosecutor: It is, your honor.

Court: All right. Defense, look upon the jury. Is this the jury selected by the defense?

Defense Counsel: Yes, your honor.

. . .

Court: [Defense Counsel], look upon the jury.

Defense Counsel: Yes.

Court: Is this the jury that's been selected on behalf of the defendant?

Defense Counsel: Yes, sir.

Court: All right. And at this stage is the manner of selecting the jury acceptable to the defendant?

Defense Counsel: Yes.

Simpson: No, it's not.

At this point the jury was removed from the courtroom. Defense counsel stated to the trial court that he sought Simpson's input on juror selection, but that Simpson did not offer much feedback; however, Simpson was dissatisfied with the jury ultimately selected. The trial court then let Simpson explain his concerns about jury selection, and tried to disabuse Simpson of misunderstandings he had about the process. At that point, the following exchange occurred:

Court: You know, you want to represent yourself? I don't think so.

Simpson: I would love that.

Court: Yeah, right.

Simpson: Yes. I promise you, I would love that because I would have been smarter. I would have known what to do. I would have in this case–

Court: But you don't know what to do, that's the problem, sir.

7

Simpson: I think I know what to do better than what he's doing by selecting this.

Court: Okay. Be quiet. Let's bring the jury in.

As a result of this exchange, Simpson contends on appeal that he was denied his constitutional right to represent himself. Although we discourage glib comments concerning self-representation like the trial court made here, we are not persuaded that Simpson's constitutional rights were violated. As mentioned above, a defendant's invocation of his right of self-representation must be both unequivocal and timely. Pretermitting whether the above exchange was an unequivocal attempt to assert the right to self-representation, we find that it was untimely.

Our Supreme Court clearly provided that, to be timely, a request must be made prior to trial. *Thaxton*, 260 Ga. at 142 (2) (holding that the trial court did not err in denying defendant's request to represent himself, which was made after the testimony of the State's third witness, because "a defendant cannot frivolously change his mind in midstream by asserting his right to self-representation in the middle of his trial") (citation and punctuation omitted). More specifically, this Court has found that a request for self-representation made after the jury was impaneled was untimely. *Mallory v. State*, 225 Ga. App. 418, 422 (4) (483 SE2d 907) (1997) (finding

8

defendant's request to represent himself was untimely when made following jury selection and just prior to the State's opening statement).

Simpson focuses on the fact that the jury had not yet been sworn, and thus the line in the sand drawn by *Mallory* does not apply. The jury, however, is impaneled prior to the time it is sworn. Georgia law acknowledges that the impaneling of a jury is separate from the jury being sworn. See, e.g., *Horton v. State*, No. S20A0799, 2020 Ga. LEXIS 740, at *15 (2) (Ga. Oct. 5, 2020) ("The time for making a motion for mistrial is not ripe until the case has begun, and the trial does not begin until the jury has been impaneled *and* sworn.") (citation omitted; emphasis supplied); *Hubbard v. State*, 225 Ga. App. 154, 155 (483 SE2d 115) (1997) ("A defendant is placed in jeopardy when, in a court of competent jurisdiction with a sufficient indictment, he has been arraigned, has pled and a jury has been impaneled *and* sworn.") (citation and punctuation omitted; emphasis supplied). Pursuant to *Mallory*, Simpson's purported request to represent himself was untimely, and this enumeration provides no basis for reversal.[3]

---

[3] Moreover, this is also consistent with how the Eleventh Circuit has handled this question. See, e.g., *Perez v. State*, 283 Ga. 196, 198 (657 SE2d 846) (2008) ("The decisions of the Eleventh Circuit are not binding on [Georgia appellate courts], but they are persuasive authority."). When confronted with a similar situation, the Eleventh Circuit held that

2. Simpson also contends that he received ineffective assistance of trial counsel. We disagree.

In Georgia,

[t]o prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and

---

[T]he district court here properly denied [the defendant's] request to proceed pro se since he made his request after the parties had selected the jury. Courts must consider the fundamental nature of the right and the legitimate concern for the integrity of the trial process. If there must be a point beyond which the defendant forfeits the unqualified right to defend pro se, that point should not come before meaningful trial proceedings have commenced. In this case, the meaningful trial proceedings commenced when the parties selected the jury; therefore, [the defendant's] request for self-representation was untimely.

(Citation and punctuation omitted.) *United States v. Young*, 287 F3d 1352, 1354-1355 (11th Cir. 2002).

credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. . . . In determining what constitutes ineffective assistance, a critical distinction is made between inadequate preparation and unwise choices of trial tactics and strategy. Particularly in regard to matters of trial strategy and tactic, effectiveness is not judged by hindsight or result. Indeed, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

(Citations and punctuation omitted.) *Walker*, 349 Ga. App. at 192-193 (4). Simpson makes two claims of ineffectiveness, which we will address in turn.

### (a) Failure to Consult with Simpson

Simpson contends that his trial counsel was ineffective for failing to adequately consult with him prior to trial, which resulted in counsel pursuing a defense strategy at odds with Simpson's trial testimony. Simpson's trial counsel presented a consent defense to the charges against Simpson – admitting that Simpson had sexual contact with both victims, but contending that it was consensual sexual contact. Simpson's trial counsel testified that he pursued this defense as a result of Simpson's refusal to

11

cooperate in establishing a defense to the charges. Against counsel's advice, Simpson testified at trial as to his version of his exchanges with both victims, which trial counsel never heard prior to the State resting its case.

Simpson testified that C. S. pursued him sexually, that they performed oral sex on each other, but that he informed her that he was not interested in any further romantic or sexual contact. He denied that he and C. S. had sexual intercourse. As for N. H., Simpson testified that N. H. flagged him down as he drove by, and he believed her to be a prostitute. N. H. attempted to sell him drugs and requested money in exchange for sex. Simpson claimed that he tried to dissuade N. H. from continuing with this lifestyle, but got mad when she continued with her advances, so he spat at her and told her she was "nasty." This testimony was inconsistent with the defense of consensual sexual intercourse with both victims which had been advanced by Simpson's counsel.

Although Simpson claims trial counsel was ineffective for pursuing a defense which was at odds with his testimony, trial counsel testified that, despite his attempt to consult with Simpson concerning his defense, Simpson refused to cooperate with him and never previously shared his conflicting version of what transpired between himself and the victims. In other words, trial counsel testified that he attempted pre-

12

trial consultation with Simpson so as to jointly craft a defense strategy, but when Simpson refused to cooperate, his counsel was forced to craft the best strategy he could on his own based on the evidence. The trial court found this testimony credible, as it was authorized to do. See *Walker*, 349 Ga. App. at 192 (4).

Given the evidence in this case – which included two women who did not know each other accusing Simpson of rape in a short window of time, Simpson's possession of the blue Magnum he stole from C. S. at the time he raped N. H., and Simpson's DNA on both victims – and in the absence of cooperation from Simpson to suggest an alternate defense theory, counsel's strategic decision to pursue a consent defense was not unreasonable and does not constitute ineffective assistance of counsel. See *Hendrix v. State*, 298 Ga. 60, 62-63 (2) (a) (779 SE2d 322) (2015) ("An attorney's decision about which defense to present is a question of trial strategy. Unless the choice of strategy is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard. An attorney's decision to pursue a particular defense is generally reasonable if it is supported by evidence in the case.") (citations and punctuation omitted).

*(b) Failure to Properly Investigate DNA Evidence*

13

At trial, a GBI forensic biologist testified that the testing performed on the sexual assault kits for C. S. and N. H. demonstrated the presence of seminal fluid from Simpson on C. S.'s vaginal swab and from N. H.'s breast swab, with no DNA from Simpson in N. H.'s rectal swab. At the motion for new trial hearing, an expert for Simpson testified that the GBI's testing of C. S.'s vaginal swab did not fully confirm that the source of Simpson's DNA was from seminal fluid, but the expert nonetheless opined that the source was indeed seminal fluid. As for N. H., the expert testified, and the State concedes on appeal, that the forensic biologist incorrectly testified that the source of Simpson's DNA on N. H.'s breast was seminal fluid. The expert did not testify that the DNA did not come from Simpson, the only issue raised concerns the source of Simpson's DNA.

On appeal, Simpson contends that his counsel was deficient for not further investigating the findings of the GBI forensic biologist: (i) to establish that further testing was available for the DNA obtained from C. S.'s vaginal swab; and (ii) so that he would have been prepared to impeach the expert on her testimony that the source of the DNA from N. H.'s breast swab was seminal fluid. We are unpersuaded.

At the outset, Simpson's trial counsel testified that he did not do further investigation into the DNA analysis because it was not important to the consent

14

defense he was advancing on Simpson's behalf. For the reasons described in Division 2 (a) above, trial counsel's strategy was reasonable under the circumstances. Moreover, we find that Simpson was not prejudiced given the overwhelming evidence of his guilt – which included two victims who did not know each other testifying to being raped by Simpson in a short period of time (which testimony was consistent with medical examinations of the victims and their demeanor at the time of their medical examinations), C. S.'s report to her brother that she had been raped by Simpson prior to her escape from him, Simpson's continued possession of the Magnum he stole from C. S. at the time of the assault on N. H., and the undisputed presence of Simpson's DNA on both victims. Even disregarding the testimony that the source of the DNA on both victims was seminal fluid, the remaining evidence overwhelmingly demonstrated Simpson's guilt. See, e.g. *Walker*, 349 Ga. App. at 195 (4) (e) (finding that evidence against defendant was overwhelming, and thus no prejudice occurred from trial counsel's failure to object to certain questions, when three victims testified to similar sexual assaults by the defendant); *Johnson v. State*, 328 Ga. App. 702, 712 (5) (b) (760 SE2d 682) (2014) (holding that evidence was overwhelming, and thus no prejudice occurred when counsel failed to object to hearsay testimony, when the evidence included the victim's outcry immediately after

15

the rape, consistent medical examination, presence of defendant's DNA inside the victim, and defendant's letter apologizing to the victim). Accordingly, Simpson's trial counsel's failure to further investigate the DNA evidence does not constitute ineffective assistance of counsel.

*Judgment affirmed. McFadden, C. J., and Doyle, P. J., concur.*